**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 23-cr-73 (CKK)** |
| | : | |
| **CRAIG EASTMAN, and** | : | |
| **CHARLES TAYLOR,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION AS TO BOTH DEFENDANTS**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this memorandum in support of its oral motion that

both defendants be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(C) [serious drug

felony], and, in the case of defendant Taylor, 18 U.S.C. § 3142 (d)(1)(A)(i) [on release pending

trial]. With respect to both Defendants, there is a rebuttable presumption that no conditions or

combinations of conditions can effectively ensure the Defendants' appearance in this case and

otherwise protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A).

The government respectfully requests that the following points and authorities, as well as

any other facts, arguments and authorities presented at the detention hearing, be considered in the

Court's determination regarding pre-trial detention.

**APPLICABLE LAW**

Pursuant to 18 U.S.C. §§ 3142(e)(3)(A), there is a rebuttable presumption that no

conditions or combinations of conditions can effectively ensure the Defendants' appearance in this

case and otherwise protect the community. The government must establish by clear and convincing

evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625,

626 (D.C. Cir. 1988)). For a detention decision based upon risk of flight, the government only need

prove by a preponderance of the evidence that there are no conditions or combinations of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). Furthermore, the government may present evidence by way of a proffer at a detention hearing. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In considering whether there are conditions of release, which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, along with the applicable rebuttable presumption, the government respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community or the Defendants' appearance at future proceedings.

## BACKGROUND

On March 9, 2023, a federal grand jury returned an indictment against Defendants Craig Eastman, Charles Taylor, and Hector Valdez, charging them with conspiracy to distribute more than 400 grams or more of a mixture and substance containing fentanyl (from January 2021 to at least February 24, 2023). Craig Eastman was charged additionally with two counts of unlawful possession with intent to distribute fentanyl (on December 4, 2021 and January 26, 2022), as well as one count of unlawful possession with intent to distribute fentanyl within 1000 feet of a protected location (on December 4, 2021).

### I.    The Overdose Death

Sadly, this case begins with a death. On January 18, 2022, a three-count indictment was

returned against Defendants Larry and Justice Eastman (Defendant Craig Eastman's older siblings), charging them with conspiracy to distribute fentanyl; distribution of fentanyl resulting in serious bodily injury; and distribution of fentanyl resulting in the death of a victim in Criminal Case 22-cr-022-CKK. The charges relate to the November 2020 overdose resulting in serious bodily injury and April 2021 overdose death of a female victim due to fentanyl toxicity and subsequent investigation that Larry and Justice Eastman supplied the victim the fentanyl pills on both occasions.

## II.    Larry and Justice Eastman Arrested

On January 26, 2022, a search warrant was executed at 2324 Raynolds Place, SE, Washington DC, where Justice Eastman was subsequently located and arrested on the indictment. Craig Eastman was inside the residence during the execution of the warrant. Found inside the residence were eight (8) blue "M-30" pills that were sent to the DEA Mid-Atlantic Laboratory for testing. On March 7, 2022, the lab results came back for the pills as positive for containing fentanyl. The net weight of the pills was .856 grams.

On January 26, 2022, approximately six hours following the execution of the Raynolds Place warrant, a second search warrant was executed at 3107 Good Hope Avenue, Apt. 607, Temple Hills, Maryland, where Larry Eastman was located and arrested on the indictment. Found inside the residence, again, was Craig Eastman.  Also inside the residence were 80 blue "M-30" pills that were sent to the laboratory where, again, on March 09, 2022, the lab result for the pills returned positive for containing fentanyl with a net weight of 8.59 grams.

Both Larry and Justice Eastman have pled guilty to Count I of their indictment, which is the fentanyl distribution conspiracy, and are pending sentencing. In his plea agreement, Larry Eastman accepted responsibility for engaging in a conspiracy and dealing fentanyl to the female

victim, who died of a fentanyl overdose just hours after being supplied by Larry Eastman. On the dates that Larry Eastman provided the female victim with fentanyl, Craig Eastman was residing in the same residence with his brother Larry. Indeed, when the female victim contacted Larry Eastman for "jammers", Larry explained that he was not home, but that his "man" had "some real glossy ones". As further described below, the evidence now seems to indicate that the pills Larry was selling to the female victim were most likely obtained from Craig Eastman and Charles Taylor, who were flying out to California and purchasing the pills in bulk from Hector Valdez (the three defendants charged in this case).

## III.    The Broader Conspiracy: Craig Eastman's and Charles Taylor's Involvement

On September 1, 2021, a search warrant was executed at 2324 Raynolds Place SE.  Craig Eastman was stopped inside a third-floor bedroom ("Bedroom 2"), which Craig claimed was his and from which assorted mail matter belonging to both Craig and Larry were located. During the search of Bedroom 2, investigators located 204 pills, which had the appearance of Oxycodone 30 mg pills. The seized pills were subsequently sent to the laboratory and found to contain 24.48 grams of fentanyl and fentanyl analog. Also recovered from Bedroom 2 were numerous firearms, magazines, ammunition, and thousands of dollars in US currency.

On December 4, 2021, another search warrant was executed at 2324 Raynolds Place SE. Inside of Bedroom 2 was mail matter addressed to Craig, a Glock 17 equipped with a high-capacity magazine and machinegun conversion device[1],  ammunition, over $1,000 and 19 blue pills labeled MT recovered from the same shoebox (consistent with fake Oxycodone pills containing fentanyl).

---

[1] It should be noted that another individual, Reginald Monroe, pled guilty on August 19, 2022, in D.C. Superior Court Case 2021-CF2-006940 to two counts of Unlawful Possession of a Firearm (Prior Conviction) for incidents that occurred on November 22, 2021 and November 25, 2021, both involving this same Glock 17 firearm. According to the Proffer of Facts entered in connection with Monroe's guilty plea, Monroe possessed this firearm on November 22 and November 25, 2021, inside of 2324 Raynolds Place, as evidenced by videos and photos posted to Instagram.  However, as the Court is no doubt aware, multiple people can possess the same firearm.

The seized pills were subsequently sent to the laboratory and found to contain 2.02 grams of fentanyl. Numerous other firearms and accessories were found in other parts of the apartment.

A search warrant was executed on an iPhone belonging to Craig that was seized as part of the September 1, 2021, search. Investigators found approximately 240+ messages involving suspected drug conversations, images, pricing, etc. These messages were with numerous individuals, to include Larry Eastman and Charles Taylor. For example, on Craig's phone, investigators located drug ledgers in the "notes" application.



Perhaps most troublingly, messages show that Craig Eastman knew that he had a "bad batch" of counterfeit pills, and yet he attempted to sell them in a fire-sale at a discounted rate.

Photos of large numbers of what appears to be fake fentanyl pills were also on the phone.



Additionally, the Glock 17 (seized from Craig's bedroom in December 2021) strongly resembles a firearm found in Craig's residence in September 2021, a photo of which was extracted from Craig's phone. Photo from the phone on the left and photo from the search on the right.



Craig Eastman's Instagram account was located in his phone.  A warrant was executed on this account. The account had messages where Craig (1bandup__) stated that he has "jammers" or is being asked for pills. "Jammers" are a common term for fake Oxycontin pills containing fentanyl. For example, on September 20, 2021, he responded via Instagram to a request for a jammer:

**Author** __deleted__bhiebeaifjajjaffc (Instagram: 8484422366)
**Sent** 2021-09-20 13:03:04 UTC
**Body** Craig

**Author** 1bandup__ (Instagram: 2314889218)
**Sent** 2021-09-20 13:07:28 UTC
**Body** Yea

**Author** __deleted__bhiebeaifjajjaffc (Instagram: 8484422366)
**Sent** 2021-09-20 13:11:51 UTC
**Body** About to come get a jammer

His Instagram communications, consistent with his phone communications, also indicate that he knew he was selling counterfeit pills.

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-14 16:26:33 UTC
  **Body** Aye brody i got jammers

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-14 16:26:41 UTC
  **Body** Same joints

**Author** brgmoney_ (Instagram: 1557493719)
  **Sent** 2021-09-14 16:27:06 UTC
  **Body** ▢ ?

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-14 16:27:11 UTC
  **Body** Yea

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-14 16:27:23 UTC
  **Body** Im hit your phone when i leave school

**Author** brgmoney_ (Instagram: 1557493719)
  **Sent** 2021-09-14 16:27:40 UTC
  **Body** Bet

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-15 18:42:16 UTC
  **Body** I got some joints
  **Share**    **Date Created** Unknown

**Author** brgmoney_ (Instagram: 1557493719)
  **Sent** 2021-09-15 18:51:06 UTC
  **Body** What you got ?

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-15 18:52:36 UTC
  **Body** I aint got dose real deals

**Author** 1bandup__ (Instagram: 2314889218)
  **Sent** 2021-09-15 18:52:39 UTC
  **Body** Yk what joints i got

Craig Eastman also communicated with Charles Taylor on Instagram to facilitate drug trafficking. A phone was recovered from Charles Taylor in an unrelated gun case. A search of that phone shows that Taylor (barkafrmdao) communicated with a now-deleted Instagram account of Craig Eastman (Bandup$!!) asking for his pills on January 14, 2022.



Taylor's Instagram account, like Craig Eastman's account, contains substantial evidence of drug trafficking, including his knowledge that he was distributing counterfeit pills. Below are photos and messages recovered from Taylor's account.





## IV.   The California Supplier: Hector Valdez

Investigators subpoenaed flight records for Craig Eastman and Charles Taylor. The results show that Craig Eastman and Charles Taylor have taken the following flights to and from Los Angeles' LAX airport.



Craig Eastman Flights                    Charles Taylor Flights

These flight records indicate that Craig and Taylor were on at least six overlapping flights to LAX, four overlapping flights back to DCA, and were in Los Angeles at the same time on eight different occasions in just 2021. Indeed, there are social media posts of the both of them in Los Angeles. The below photo is taken from Craig Eastman's Instagram account, which has tagged Charles Taylor's account and shows both of them riding in a vehicle, with a geotag of Los Angeles.



One particular flight, on January 16, 2021, shows Craig Eastman on a flight from Washington, D.C. to Los Angeles, and returning January 19, 2021, from Los Angeles to Washington, D.C. This flight is significant because on January 17, 2021 (when Craig Eastman is in Los Angeles), Craig received a text message from Larry Eastman (Craig's brother who has since pled guilty to distributing fentanyl) saying "Wasssup w dem bags I'll look out if u have to bring it back for me". Craig responded with "I aint go see da nigga yet but I gotta see doe". Craig continued with "If not ima have some cool ass numbers too". On January 18, 2021, Craig texted Larry a photo of a plastic bag full of small round light-blue pills. Larry responded by stating "They torch

jammers Nd y'all bringing them back?" This is Larry asking Craig if the fentanyl pills (Jammers) are good quality and if Craig is bringing them back from Los Angeles to the Washington, D.C. area. Craig responds to the text thread by stating "Ni##as been dickeating em but idk & yea". This is Craig saying that he is not aware of the strength of the pills and he is in fact bringing the pills back to the Washington, D.C. area.

Craig and Taylor's California supplier was determined to be Hector Valdez, who is based in Los Angeles, and is the third defendant charged in this case. A review of Taylor's flight records revealed a flight taken by Taylor on February 8, 2021, from Washington, D.C. to Los Angeles and returning from Los Angeles to Washington, D.C. on February 13, 2021. On February 11, 2021, during the time Taylor was in Los Angeles, a text message conversation took place between Taylor and Craig. During this text message conversation, Craig texts Taylor "You aint bouta get no jammers from hector?", "If you do tell his ass he gotta make em last longer & gotta make em a Little Bit Stronger", and "Tell hem make sure dey got da lil M's on there". Additionally, on March 12, 2021, Craig texts Taylor stating "I was tryn ask you can you meet hector for me, ima cashapp da money". Taylor responds with "Rd". Craig replies "ima send you 750". Taylor responds with "He ain't text me back", "Nvm", "Find me a glizzy".[2] Craig replies "lte juss lmk when yu need me get da money", "& I juss called jumbo he said he gon try & find one before da night ova". Shortly after, Taylor replies to Craig with "Small Ms big 30s". A few texts later, Taylor sends Craig a link to Hector's cashapp account "$hector202323". Craig replies with "Make sure you count em, I got 150". This conversation is Craig asking Taylor to meet Hector and purchase 150 fentanyl pills for $750 on Craig's behalf. Taylor acknowledges and wants Craig to find a gun for him.

---

[2] A "Glizzy" is one of many street terms used to refer to gun.

Valdez was arrested in California on February 24, 2023. Approximately 4.5 kilos of M-30 pills and half a kilo of fentanyl powder was found in his residence.  He was ordered detained, and has been transferred to this Court.

## V.    Arrest of Charles Taylor and Craig Eastman

On March 22, 2023, law enforcement executed a search warrant at 1910 Ridgecrest Ct, #202, Washington, DC. Inside, they located both Craig Eastman and Charles Taylor, along with several others, including juveniles.  Law enforcement also located seven firearms (one of which is a suspected machinegun), ammunition, firearm accessories, and two garbage bags of suspected marijuana. A box of ammunition was also thrown out the window.





The USMS discovered a small number of white pills inside of Taylor's underwear upon his lockup.



**ARGUMENT**

**I.      The Defendants Should Be Detained Pending Trial Because They Pose a Danger to the Community and Risk of Flight**

In light of the nature and circumstances of the offenses charged, the weight of the evidence against each defendant, each defendant's criminal history and characteristics, and the dangers to the community posed by any defendant's release, the defendants cannot overcome the presumption that they are a danger to the community and a risk of nonappearance. To the contrary, these factors establish that the presumption is correct.

**A.      The nature and circumstances of the offense**

The nature and circumstances of the charged offenses weigh in favor of detention. The grand jury found probable cause to believe that both defendants were engaged in a conspiracy to distribute more than 400 grams of fentanyl, dating back to January 2021. At this point in the opioid epidemic, it is common knowledge that fentanyl kills. According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past

15

usage."[3] According to the CDC, overdose deaths in the United States continue to rise, with more than 80 percent of such deaths attributed to synthetic opioids, primarily fentanyl:[4]  In 2021, the United States set a record high, with drug overdose deaths toppling 100,000 and fentanyl causing nearly two-thirds of these deaths.[5] According to Howard University Hospital, the District has close to 400 opioid related deaths per year – contributing to the third highest opioid mortality rate in the country with 34.7 deaths per 100,000 persons compared to the national average of 14.6 deaths.

Here, Defendants were dealing fentanyl, which is made worse by the fact that it was disguised and passed off as legitimate oxycodone. Worse yet, both defendants knew they were dealing faking pills, and yet they persisted in this dangerous endeavor.  Perhaps most troubling of all, there is at least one message conversation, discussed above, where Craig Eastman knows that he has a "bad batch" of pills, and instead of showing a modicum of regard for human life, he instead decides to sell the pills in a fire sale. While the government has not charged either defendant with the death of the female overdose victim, it appears that Craig Eastman was supplying Larry Eastman with pills, who in turned supplied the fatal drugs to the female victim.

**B.  The weight of the evidence against each defendant**

The weight of the evidence against each defendant is extremely strong. As laid out in the factual background, evidence from both defendants' social media accounts and cellphones clearly show them distributing these dangerous narcotics in a conspiracy, as well as the possession of firearms. Moreover, law enforcement seized fentanyl pills from Craig's residence on three occasions with mail matter, as well as multiple guns from the residence.

- Social Media and Cellphone Evidence

---

3 https://www.dea.gov/resources/facts-about-fentanyl
4 https://www.cfr.org/in-brief/us-fentanyl-crisis-what-know
5 https://www.cnn.com/2021/11/17/health/drug-overdose-deaths-record-high/index.html

o Both defendants' Instagram accounts contain photos of hundreds if not thousands of blue M-30 fentanyl pills, and Taylor's Instagram contains at least one photo of blue M-30 fentanyl pills with the words overlaid, "Wholesale Good Number S."

o Both defendants' Instagram accounts contain numerous messages about the distribution of these blue M-30 pills, including knowledge that both of them knew these were counterfeit pills. In the case of Craig Eastman, there is at least one message of him trying to offload a "bad batch" of these dangerous drugs.

o Both defendants' cellphones contain photos evincing the distribution of these blue M-30 pills. In the case of Craig Eastman, the phone also contains images of a firearm similar to one recovered inside his bedroom as part of the December 2021 search.

- Travel Records

o Craig and Taylor were on at least six overlapping flights to LAX, four overlapping flights back to DCA, and were in Los Angeles at the same time on eight difference occasions in just 2021. These dates correspond to dates of messages received and sent evincing them acquiring M-30 pills. For example, according to Taylor's flight records, he flew from DCA to LAX on February 8, 2021, and did not return to DCA until February 13, 2021. On February 11, 2021, during the time Taylor was in Los Angeles, Craig texted Taylor "You aint bouta get no jammers from hector?", "If you do tell his ass he gotta make em last longer & gotta make em a Little Bit Stronger", and "Tell hem make sure dey got da lil M's on there".

- Physical Seizures

o September 1, 2021, search warrant at 2324 Raynolds Place SE. Craig Eastman was stopped inside a third-floor bedroom, which Craig claimed was his. Inside the bedroom

were 204 pills that tested positive to contain 24.48 grams of fentanyl and fentanyl analog, along with numerous firearms, magazines, ammunition, and thousands of dollars in US currency.

o   December 4, 2021, search warrant at 2324 Raynolds Place SE, where both Craig Eastman and Charles Taylor were present.  Inside of Craig's bedroom, investigators found a Glock 17 equipped with a high-capacity magazine and switch, ammunition, over $1,000 and 19 blue pills labeled MT recovered from the same shoebox that tested positive to contain 2.02 grams of fentanyl. Numerous other firearms and accessories were found in other parts of the apartment.

o   January 26, 2022, search warrant at 2324 Raynolds Place, SE, where Craig Eastman was present. Found inside the residence were eight (8) blue "M-30" pills that tested positive for containing fentanyl. The net weight of the pills was .856 grams.

o   January 26, 2022, search warrant at 3107 Good Hope Avenue, Apt. 607, Temple Hills, Maryland, where Craig Eastman was present. Found inside the residence were 80 blue "M-30" pills that tested positive for containing fentanyl with a net weight of 8.59 grams.

o   February 24, 2023, search of Hector Valdez's residence in Los Angeles, California. Approximately 4.5 kilos of M-30 pills and half a kilo of fentanyl powder was recovered inside his residence.

o   March 22, 2023, search of 1910 Ridgecrest Ct, #202, where both Craig Eastman and Charles Taylor were located and arrested.  Seven firearms and assorted firearm accessories were recovered from inside the location.  White pills were recovered from inside of Taylor's underwear.

### C.  The history and characteristics of the Defendants

The history and characteristics of the defendants also weigh in favor of detention. Craig Eastman appears to have at least one prior gun case, and his proclivity for dealing dangerous pills may be second to only his proclivity for possessing firearms.  As noted above, the December 4, 2021, search warrant of 2324 Raynolds Place SE yielded a Glock 17 equipped with a high-capacity magazine and a switch inside of Craig Eastman's bedroom.  Further, there are text messages between him and Charles Taylor about acquiring firearms ("find me a Glizzy").

With respect to Taylor, the court need look no further than the fact that he is currently on pretrial release for a gun case in D.C. Superior Court when many of the facts alleged in this case occurred.  Notably, while the PSA in this case states only that Taylor has been reporting as directing, the truth of the matter is that PSA in that case has filed no less than eight (8) notices of noncompliance.  A PSA Report filed in the D.C. Superior Court docket on January 26, 2023, attached as Ex. 1, states that on "1/25/2023, the defendant tested positive for an illicit substance. . . . PSO Prior would note that she offered a substance use disorder assessment to the defendant; however, he was not interested as he denies using illicit substances." Ex. 1 at 2.  The substance he tested positive for was none other than opioids.  *Id*. at 9.  Further, the report details an extended history of his violations, as excerpted below.

On 9/2/2022, the court vacated the defendant's home confinement condition and placed him on 10pm-6am curfew.

On 9/16/2022, the defendant violated his curfew by failing to return home until 11:10pm. As a result, the defendant was sanctioned to 30 days of 8pm curfew.

On 9/17/2022, the defendant violated his curfew by failing to return home until 10:26pm. As a result, the defendant was sanctioned to 7 days of home confinement.

On 9/19/2022, the defendant violated his curfew by failing to return home until 10:51pm. As a result, the defendant was sanctioned to 14 days of home confinement.

On 10/12/2022, the defendant successfully completed his home confinement sanction (total of 21 days) and was moved to 8pm-6am curfew for a period of 30 days.

On Friday 10/14/2022, the defendant violated his 8pm curfew sanction by failing to return home until 8:22pm. As a result, the defendant was sanctioned to 21 days of home confinement. When confronted about this violation, the defendant stated he was late because he was going to get his GPS charger. However, PSA would note that the defendant did not have permission, nor did he even charge his GPS device until well after 9pm on Saturday 10/15/2022. In addition, the defendant was extremely verbally aggressive towards This Officer when she had to impose the sanction.

On 10/25/2022, the defendant was seen in court and admonished for his non-compliance.

On 10/15/2022, the defendant did not return home until 8:05pm. A verbal warning was issued.

On 11/8/2022, the defendant did not return home until 10:10pm. A verbal warning was issued.

On 11/20/2022, the defendants GPS device expired at 6:10pm. On 11/22/2022, the defendant was instructed to report to PSA offices, with his charger, to see if there was an issue with the device or the charger. It was made clear to the defendant that if he didn't report as instructed, PSA would have not way to determine if the dead battery was due to equipment or the defendants lack of compliance with charging. The defendant failed to report to PSA on 11/22/2022 as instructed. The GPS battery remained dead from 11/20/2022 at 6:10pm until 11/28/2022 when the defendant finally reported to PSA offices. When he reported, he failed to provide his allegedly damaged charger. He was provided with a new charger and a new GPS tracking device, since the one he was currently wearing had no power. PSA was unable to monitor the defendants movements from 11/20/2022 to 11/28/2022. The defendant is sanctioned to permanent home confinement until all violations are addressed by the court. A request for removal from PSA supervision was submitted to the court.

On 12/3/2022, the defendant violated his home confinement sanction by leaving his home without permission from approximately 1:12pm-1:20pm, and traveling to what appears to be a convenience store located on or near Alabama Ave SE. Removal from PSA supervision is requested.

11/28/2022. The defendant was instructed to report to PSA offices on 12/5/2022 with his allegedly damaged charger, so that the device and charger could be inspected and replaced if necessary. The defendant failed to report as instructed. As a result, PSA has no way to determine if the charger is actually damaged or not. The defendant was a complete loss of contact until he began charging his GPS device again at 8:59am on 12/6/2022; as a reminder, the defendant never came to PSA to have his allegedly broken charger inspected, indicating that his charger is working and that the device battery died due to the defendants lack of charging and not an equipment malfunction. PSA was unable to monitor the defendants movements from 12:06pm on 12/4/2022 to 8:59am on 12/6/2022. Due to this continued non-compliance, removal from PSA supervision was again requested.

On 12/8/2022, the defendant was seen in court; he was admonished for his non-compliance and placed on permanent home confinement.

On 12/9/2022, PSA received a strap tamper alert at 9:51am. PSO Prior immediately contacted the defendant to ask what happened to his GPS device as she had received a tamper alert. The defendant stated that nothing had happened to his GPS device and he had no idea why an alert had been received. PSO Prior instructed the defendant to report to PSA immediately to have his device inspected. The defendant reported on 12/9/2022 as instructed. He was seen by the GPS contractors who, after inspection of the device, deemed the tamper alerts to be valid. They reported that the GPS device strap is severely damaged, appears to have possible burn/melt marks on it, and has an internal wire sticking out of the band. The defendant was given a new strap and sent home. PSO Prior called the defendant and again asked what happened to his GPS device as it was clearly damaged. The defendant then said "that happened on the dirt bike, weeks ago". PSO Prior informed the defendant that she does not believe his account of what happened to his GPS device and would be forwarding the information on to the court.

Due to the defendants continued non-compliance, removal from PSA supervision was again requested.

On 12/22/2022, the defendant was seen in court, admonished for his non-compliance, but allowed to remain in HISP. Due to the defendant not being removed from supervision, PSA allowed the defendant to move to 8:00pm-6:00am curfew.

Due to lack of sufficient charging (the defendant did not charge his GPS device at all on 12/23/2022, 12/24/2022, or 12/25/2022), the GPS battery expired completely on 12/25/2022 at 10:13pm. The GPS remained off, and PSA was unable to monitor the defendants movements, until he began charging again on 12/26/2022 at 12:25am. Due to this non-compliance, the defendant was placed back on permanent home confinement until the violations were addressed by the court. Removal from PSA supervision was again requested.

On 1/13/2023, the defendant was seen in court, admonished for his non-compliance, but allowed to remain in HISP. Due to the defendant not being removed from supervision, PSA allowed the defendant to move to 10:00pm-6:00am curfew.

Troubling, many of these violations relate to violations of his GPS monitoring conditions, such as what appears to be an attempt on December 9, 2022, to remove the device itself.  Sadly, all of these violations culminated in the two most serious violations of all: engaging in the instant criminal conspiracy to distribute fentanyl; and the presence of 7 firearms in his residence.

**D. The nature and seriousness of the danger to any person or the community posed by the person's release**

The fourth factor–the nature and seriousness of the danger to any person or the community posed by the person's release–also weighs in favor of detention.  Each defendant's release poses a physical danger to the community. As previously stated, fentanyl is now the leading cause of overdose deaths in the United States, which hit a record high in 2021. Here, Defendants are charged with distributing fentanyl, and what cannot be stated enough, they are knowingly distributing fake drugs with the potential to maim and kill people.  Accordingly, each defendant's release would pose a serious danger to the community.

## CONCLUSION

For the reasons noted above, the government respectfully submits that clear and convincing evidence establishes that there are no conditions or combinations of conditions that will reasonably assure the safety of any other person and the community. Accordingly, the government respectfully requests that the Court grant the government's motion to detain each defendant pending trial in this case.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

 _/s/  Andy T. Wang_
ANDY T. WANG
Assistant United States Attorney
Violent Crime and Narcotics Trafficking Section
601 D Street, N.W.
Washington, D.C. 20530
D.C. Bar No. 1034325
Andy.wang@usdoj.gov
202-870-4940

22